UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DEBRA HOWARD,

                Plaintiff,

    v.

PATENAUDE & FELIX APC,

                Defendant.

CASE NO. 21-CV-00686-LK

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Plaintiff Debra Howard's Motion for Partial Summary Judgment, Dkt. No. 17, and Defendant Patenaude & Felix APC's Cross-Motion for Summary Judgment, Dkt. No. 20. For the reasons discussed below, the Court grants Howard's motion and denies Patenaude & Felix's cross-motion. Howard has reserved the issue of damages for trial.

## I.      INTRODUCTION

This is a debt collection case, and the material facts are undisputed. Plaintiff Debra Howard accrued a balance on her Target credit card several years ago. Dkt. No. 17-2 at 1. When she failed

1  to make monthly payments, Howard was sent to collections. Target hired Patenaude & Felix

2  ("P&F") to collect the debt. Dkt. No. 29-1 at 55–57.[1]

3  <u>The 2016 Judgment and P&F's Garnishments</u>

4  P&F made several unsuccessful attempts to bill Howard before filing suit in Pierce County

5  Superior Court for the principal debt amount of $3,847.25. Dkt. No. 22 at 1; Dkt. No. 29-1 at 58–

6  59.[2] In September 2016, the superior court entered a default judgment against Howard for

7  $4,194.76, with post-judgment interest accruing at 12% per year. Dkt. No. 22 at 1; Dkt. No. 22-2

8  at 1. That amount included the principal ($3,847.26), costs ($347.50), and attorney fees ($0). Dkt.

9  No. 22-2 at 1. P&F then commenced four garnishments between September 2016 and February

10  2018 to collect the judgment amount plus interest. Dkt. No. 22 at 1–2; Dkt. No. 21 at 2; *see also*

11  Dkt. No. 17-2 at 2 ("Since I had two busy careers and I was getting myself and my family ready

12  for retirement, I thought the most efficient way to be done with the debt was just allow the wage

13  garnishments to happen."). Before recounting the details any further, however, the Court briefly

14  summarizes Washington's garnishment procedure to contextualize what happened in this case.

15

16  [1] Howard objects to P&F's July 2022 declaration and her attached deposition testimony, Dkt. Nos. 29, 29-1, as untimely. *See* Dkt. No. 30 at 1. She urges the Court to "strike or disregard" the filing because "[t]he briefing window"

17  for the parties' summary judgment motions "closed many months ago," and she has been "deprive[d] . . . of the ability to meaningfully respond." *Id.* at 1–2. P&F claims that Howard's deposition testimony is "highly relevant new

18  evidence" and "will be useful in deciding the parties' pending cross-motions for summary judgment." Dkt. No. 29 at 1. The Court acknowledges its discretion to strike untimely declarations, especially when the opposing party is prejudiced. *See Bell v. Boeing Co.*, No. 20-CV-01716-LK, 2022 WL 1206728, at *2 (W.D. Wash. Apr. 22, 2022).

19  Here, however, the Court exercises its discretion to consider P&F's July 2022 declaration. P&F deposed Howard on July 6, 2022—prior to the close of discovery, *see* Dkt. No. 12 (discovery closed on July 10, 2022)—and promptly

20  moved to supplement the record. *Cf. Cascade Yarns, Inc. v. Knitting Fever, Inc.*, No. 10-CV-861-RSM, 2014 WL 4925487, at *2 (W.D. Wash. Sept. 30, 2014) (finding untimely declarations "substantially justified" where evidence

21  "did not exist at the time that [the party] filed its opposition brief" and party "diligently moved to supplement the record"). The Court is also "mindful that public policy favors the disposition of matters on their merits and on the

22  most complete available and admissible record." *Id.*; *see also Neff v. Desta*, No. 18-CV-1716-RSL, 2020 WL 606586, at *1 (W.D. Wash. Feb. 7, 2020) ("The Court declines to strike the untimely reply or declaration . . . given its

    preference for deciding issues on the merits with the benefit of full information."). And in any event, Howard's deposition testimony does not alter the outcome.

23  [2] In his affidavit, Matthew Cheung (an attorney for P&F) avers that P&F sued Howard for $3,847.25; however, the

24  default judgment P&F later obtained lists the principal debt amount as $3,847.26. *Compare* Dkt. No. 22 at 1 *with* Dkt. No. 22-2 at 1.

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT - 2

1    State law requires plaintiffs like P&F to first apply for a writ of garnishment with the

2    superior court. *See* Wash. Rev. Code § 6.27.060. The superior court issues the writ of garnishment

3    to the garnishee and directs the garnishee to answer the writ. *See id.* § 6.27.070. Once the garnishee

4    answers the writ, *see id.* § 6.27.190, and assuming the garnishee's answer is not controverted, *see*

5    *id.* § 6.27.210, the superior court will render judgment against the garnishee in the amount "found

6    to be due to the defendant from the garnishee," *id.* § 6.27.250(1)(a). Washington law then permits

7    plaintiffs to "apply for the judgment and order to pay ex parte." *Id.* Where, as here, the plaintiff

8    does so, the superior court "order[s] the garnishee to pay to the plaintiff or to the plaintiff's attorney

9    *through the registry of the court* the amount of the judgment against the garnishee[.]" *Id.* (emphasis

10   added). The clerk of court "note[s] receipt of any such payment" and, as particularly relevant here,

11   "disburse[s] the payment to the plaintiff." *Id.*; s*ee also* Dkt. No. 21 at 1 (summarizing these steps).

12   P&F followed this procedure for all four garnishments. And for the first three, things went

13   off without a hitch. The initial garnishment occurred on December 29, 2016, when P&F sought

14   and obtained an order for $173.01 (plus $96 in costs) from Howard's bank account at Harborstone

15   Credit Union. *See* Dkt. No. 21-1 at 1–2 (December 2016 judgment on answer and order to pay).

16   Two successful garnishments of Howard's wages followed on August 17, 2017 ($1,788.61), and

17   February 2, 2018 ($2,174.30). *See* Dkt. No. 21-2 at 1–2 (August 2017 motion to disburse funds);

18   Dkt. No. 21-5 at 1–2 (August 2017 order disbursing funds); Dkt. No. 21-3 at 1–2 (February 2018

19   motion to disburse funds); Dkt. No. 21-6 at 1–2 (February 2018 order disbursing funds). In all

20   three proceedings, the clerk disbursed the garnished funds to P&F in accordance with state law.

21   Not so with respect to the ill-fated fourth garnishment.

22   On February 23, 2018, P&F applied for the final writ of garnishment. It sought to collect

23   the remaining balance of the default judgment ($63.84), the interest on the judgment that accrued

24   between September 2016 and February 2018 ($350.04), and garnishment costs ($85.50) for a total

1  of $499.38. Dkt. No. 17-3 at 10. On August 21, 2018, after Howard's employer answered the writ

2  and tendered payment to the court registry, P&F moved to disburse the garnished funds. *See* Dkt.

3  No. 21-4 at 1–2 (August 2018 motion to disburse funds). The court accordingly ordered the clerk

4  to disburse to P&F $492.38. *See* Dkt. No. 21-7 at 1–2 (August 2018 order disbursing funds).[3] But

5  this money never made it into P&F's pockets. As it turns out, the clerk failed to transmit the funds.

6  Dkt. No. 21 at 2. P&F thus never credited Howard's account with the fourth garnishment. *Id.*

7  _The Debt Resurfaces_

8  More than two years passed without a word. Then, in December 2020, P&F left Howard a

9  voicemail alleging that she owed a balance on the September 2016 judgment. Dkt. No. 17-2 at 2.

10  This marked the beginning of Howard's four-month odyssey to resolve the issue—one that entailed

11  as many as 11 phone calls and five voicemails, most of which went unanswered or unreturned. *See*

12

13

14

---

15  [3] There is a slight discrepancy between this amount ($492.38) and the amount sought in P&F's February 2018 writ of
garnishment ($499.38). Howard asserts that the lesser amount was "determined by the employer based on the

16  garnishment paperwork it had received"—garnishment paperwork which included estimated costs. Dkt. No. 23 at 3
n.1; *see* Dkt. No. 17-3 at 10 (writ of garnishment itemized costs). Howard argues, however, that she owed only
$431.58. Dkt. No. 23 at 3. According to her, this amount is comprised of the then-remaining balance on the September

17  2016 judgment ($63.84), the interest that accrued on the judgment between September 2016 and February 2018
($350.04), and an additional amount that she concedes "lawfully accrued" during the garnishment proceedings

18  ($17.90). *Id.* Howard specifically takes issue with the $85.50 in costs itemized on P&F's February 2018 writ of
garnishment. *Id.* She contends that P&F "never obtained a judgment (RCW 6.27.250) and thus was never entitled to
[these costs]." *Id.* The Washington Supreme Court has made clear that, "when a garnishee's indebtedness to the

19  principal defendant is uncontroverted and the indebtedness is due and owing[,] a creditor must obtain a judgment
against a garnishee in order to collect the amount, attorney fees, and filing costs allowed" by Washington Revised

20  Code §§ 6.27.090(2) and 6.27.250(1)(a). *See Watkins v. Peterson Enters., Inc.*, 973 P.2d 1037, 1049 (Wash. 1999);
*accord Campion v. Credit Bureau Servs., Inc.*, No. CS-99-0199-EFS, 2000 WL 33255504, at *9 (E.D. Wash. Sept.

21  20, 2000). And as Howard notes, it appears that P&F "elected not to follow that procedure, and instead filed a motion
to distribute the funds" once her employer garnished and transmitted them to the court registry. Dkt. No. 23 at 3. The
records P&F submitted contain only the December 2016 judgment on answer and order to pay, which relates

22  exclusively to the initial garnishment of Howard's account at Harborstone Credit Union for $173.01 plus $96 in costs.
*See* Dkt. No. 21-1 at 1–2. For the remaining three garnishments, P&F simply moved for an order disbursing the funds

23  once Howard's employer answered the writ and transmitted the garnished amounts to the court registry. *See* Dkt. Nos.
21-2, 21-3, 21-4. Since P&F garnished $492.38 when Howard owed only $431.58, she suggests that the difference—
$60.80—is technically "due" back to her. Dkt. No. 23 at 4 & n.3. The Court need not further address this issue, though,

24  as Howard has stated that it "is not the basis for this lawsuit[.]" *Id.* at 4 n.3.

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT - 4

Dkt. No. 29-1 at 33; Dkt. No. 17-2 at 2.[4] Whenever she succeeded in reaching a P&F representative, the format of the discussion was the same: the representative told Howard that she owed money; Howard disputed the debt; and the representative promised to investigate the debt and get back to her. But P&F never followed up with Howard on the results of its investigation. Howard now relies on four communications as the basis for this suit.

First up is a December 21, 2020 phone call with a P&F account representative. *See* Dkt. No. 17-3 at 14. There the representative told Howard that she owed $1,011.47 for the Target debt. *Id.* at 17. According to the representative, Howard had paid only $4,130.92 of the $5,142.39 account balance—the latter of which included $1,295.13 in accrued interest. *Id.* at 18. Howard further learned that the $2,174.30 wage garnishment in early February 2018 (the third garnishment) was the last amount credited to her account. *Id.* at 20. Howard took issue with this accounting. *See id.* at 17–18 ("[T]he final—the balance owed was $63.84; interest from the judgment up until February 2018 was [$]350; processing fees, [$]499[.] And that was garnished."). And when Howard referenced the February 23, 2018 writ of garnishment, the representative promised to consult a P&F attorney and call back with the results of the investigation. *Id.* at 20.

That never happened. But P&F's senior paralegal did investigate the debt. Either the account representative to whom Howard spoke or another account representative from P&F's San Diego office contacted the paralegal on December 21, 2020—the same day of Howard's call—to inform her that "a consumer . . . believed that the balance on her account had been fully paid through garnishment." Dkt. No. 21 at 2. The paralegal immediately "reviewed the account and determined that the court had signed an order disbursing . . . the fourth and final garnishment of $492.32 on August 21, 2018." *Id.* She likewise concluded that although Howard's employer "had

---

[4] Although the parties appear to dispute the exact number of calls and voicemails, *see* Dkt. No. 29-1 at 33–36, the issue is immaterial.

1  already sent the funds to the [c]ourt," P&F "had not actually received the funds." *Id.* The paralegal

2  then called the clerk at the Pierce County Superior Court and "was told . . . that they had made a

3  mistake and had forgotten to remit the funds to [P&F] back in August 2018." *Id.* at 3.  The clerk

4  apologized and indicated that he would mail the check for the garnished funds the following

5  morning. *Id.* According to the paralegal's declaration now before the Court, had P&F received the

6  check in August 2018, "the judgment would have been satisfied[.]" *Id.* at 3.[5]

7        P&F communicated none of this information to Howard. Nor did the paralegal's December

8  2020 phone call to the clerk end the administrative debacle. Despite promising to send P&F a

9  check for the final garnishment, the clerk again failed to do so, and Howard's account remained

10  open for several more months. *See* Dkt. No. 21 at 3. P&F meanwhile forged ahead with its

11  collection efforts. On February 18, 2021, it sent Howard a letter proposing to settle the remaining

12  debt for $505.74, or 50% of the alleged account balance ($1,011.47). *See* Dkt. No. 17-2 at 6. P&F's

13  letter urged Howard to call its office "to confirm arrangement" before the settlement offer expired

14  on April 4, 2021. *Id.* It further indicated that, upon receipt of such payment, Howard's account

15  would be "considered settled in full and no more sums w[ould] be due and payable." *Id.*

16        Howard called P&F and spoke with another account representative on February 25, 2021.

17  *See* Dkt. No. 17-3 at 24. Here again, P&F failed to provide an update on its purported investigation

18  into the disputed debt amount and continued to claim that Howard owed a balance on the judgment.

19  The representative confirmed that P&F received only the funds from the first three garnishments

20  ($4,130.92 total) and that the balance on Howard's account was $1,011.47. *See id.* at 30–31. The

21

22  ---
[5] Matthew Cheung, a P&F attorney, echoes this assertion in his declaration. *See* Dkt. No. 22 at 3 ("If the Clerk had

23  sent us the funds in a timely manner, the account would have been closed in 2018 [and] the judgment would have been satisfied[.]"). These averments are interesting in light of P&F's insistence elsewhere in the record that Howard still owes a balance on the 2016 judgment. *See, e.g.*, Dkt. No. 20 at 8 ("Even if interest were frozen on February 9,

24  2018, to this day there actually remains an unpaid balance [of] $96.00 in costs that were reduced to judgment, as well as $165.32 remaining in interest.").

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT - 6

representative further explained that, following P&F's receipt of the third garnishment, Howard's account balance was $892.46—an amount different from that sought by P&F in its final writ of garnishment. *See* Dkt. No. 17-3 at 31–32.[6] Howard immediately noted this discrepancy. *See* Dkt. No. 17-3 at 31 ("Whoa, whoa, whoa, whoa, whoa. Why—why was there a balance not written up . . . on that final garnishment? Why wasn't that added into the final garnishment order[?]"); *id.* at 32 ("Because I've got a garnishment here, a second [sic] writ of garnishment dated 23, February, 2018 for a total of $499.38. Why wasn't that [$]800 in there?"). In response, the representative continued to parrot generalizations about a reoccurring balance and accruing interest. *See id.* at 32–35. She also briefly suggested that the remaining balance was a result of court costs—another contention that Howard refuted. *See id.* at 33 ("No, no, no, no. The court costs were already added into this. The original debt was $3,847. The court cost was [$]347. That was [$]4,194.").[7] The call concluded with the representative indicating that P&F needed to "reach back out to [its] client." Dkt. No. 17-3 at 36. The representative promised, however, that P&F would "have a response" for Howard if she called back "within 24 hours." *Id.*

Howard was unable to reach a P&F account representative for the next three weeks. *Id.* at 46. On March 25, 2021, she was finally patched through to yet another account representative. *See id.* at 44, 47.[8] That representative informed Howard that her account was "still in the process . . .

---

[6] The representative suggested during the call that this $892.46 accrued interest between 2018 and 2020, and ultimately grew into the $1,011.47 balance. *See* Dkt. No. 17-3 at 31 ("[D]uring the time that we did receive the balance on that— or the payments on that garnishment—you still had a balance of the [$]892.46 that had not been met, so that's why there's still a balance that is still owed. And since then, the interest ha[s] accrued. So it is at this time for the $1,011 and 40[.]"). But none of the accountings P&F provides in its supporting declarations corroborate that statement. Indeed, the $892.46 figure does not appear anywhere in those accountings. *See* Dkt. No. 22 at 2–3; Dkt. No. 26 at 2. Nor does P&F otherwise defend that number. *See* Dkt. No. 20 at 8, 15, 19.

[7] Howard went on to note, correctly, that P&F's fourth and final writ of garnishment accounted for the accrued interest and all associated costs. *See* Dkt. No. 17-3 at 10, 33.

[8] The record suggests that Howard reached the first account representative with whom she spoke in mid-March but was directed to call back later. Howard did so to no avail. *See* Dkt. No. 17-3 at 48 ("And the last word I had from [the

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT - 7

of investigation [and] dispute." Dkt. No. 17-3 at 48. And despite the paralegal's knowledge of the administrative mishap at the Pierce County Superior Court, the account representative indicated that P&F had no new information. *Id.* at 51. Something else happened, too. The representative told Howard that, after P&F received the third garnishment in early February 2018, her account balance was $499.38. *Id.* at 54.[9] This amount accrued 10 cents in interest per day, culminating in the current balance of $1,011.47. Dkt. No. 17-3 at 54–55.[10] Howard once again reiterated her belief that a fourth garnishment in August 2018 had taken care of the remaining balance. Dkt. No. 17-3 at 54. But because P&F allegedly had no record of this, the representative directed Howard to "send . . . over" copies of her paystubs as proof. *Id.* at 54; *see also id.* at 56 ("[Y]ou have to find something that shows that amount that came out because we did not receive it, ma'am. If you—if it did come out of your paycheck, they did not send it to us."). Howard agreed to do so. *Id.* at 56.

Howard Sues P&F

The record is unclear as to whether Howard ever provided the pay stubs to P&F or what communication—if any—she had with P&F after the March 25th call.[11] She consulted an attorney shortly thereafter and, in May 2021, prepared a lawsuit alleging violations of federal and state debt collection laws. *See* Dkt. No. 1-1. Howard specifically alleges claims under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692e, 1692e(2), 1692e(5), 1692e(10), 1692f, and 1692f(1); the Washington Collection Agency Act ("WCAA"), Wash. Rev. Code §

---

first representative] was to call back on the 15th, which I did and I left a message. I called back on the 17th and I called back Monday of this week and now I'm calling again.").

[9] This representative made no mention of the $892.46 that the second account representative repeatedly referenced.

[10] Of course, and as detailed in footnote 14 below, this is mathematically impossible. *See* Dkt. No. 23 at 10 (noting that, if Howard owed $499.38 on the judgment in February 2018, there is no "mathematical scenario in which interest could have accrued to bring the balance to $1,011.47" by February 2021 because 10 cents per day results in a mere $36.50 per year).

[11] Howard's complaint alleges that she obtained the pay stubs but P&F "refused to accept the very information it demanded from her." Dkt. No. 1-1 at 5.

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT - 8

1    19.16.250(21); and the Washington Consumer Protection Act ("CPA"), Wash. Rev. Code § 19.86

2    *et seq*. Dkt. No. 1-1 at 6–8.[12] In addition to actual and statutory damages, Howard seeks injunctive

3    relief under the CPA. Dkt. No. 1-1 at 8–9; *see* Wash. Rev. Code § 19.86.090. P&F removed the

4    case to federal district court. Dkt. No. 1; *see* 28 U.S.C. §§ 1441(a), 1446(a)–(b).

5            Meanwhile, the paralegal contacted the clerk at the Pierce County Superior Court to inquire

6    about the status of the funds from the fourth garnishment. Dkt. No. 21 at 3. As of early May 2021,

7    the clerk had still not mailed the check. *Id.* And due to yet another administrative mishap with

8    P&F's mailing address, it did not receive the $492.38 until May 26, 2021. *See id.* at 3–4. P&F

9    finally credited Howard's account with this sum nearly three years after garnishing it from her

10   wages. *Id.* at 4. Following the close of discovery, Howard moved for summary judgment on

11   liability under the FDCPA, WCAA, and the CPA, but reserved damages for trial. Dkt. No. 17 at

12   2, 15. P&F cross-moved for summary judgment on all issues. Dkt. No. 20 at 3.

13                                    **II.    DISCUSSION**

14           Howard is entitled to summary judgment on all her claims. Despite P&F's efforts to blame

15   the superior court clerk for what happened in this case, a debt collector is strictly liable under the

16   FDCPA when it attempts to collect a debt that is not legally owed. And the bona fide error defense

17   does not shield P&F from liability where, as here, its procedures are not specifically adapted to

18   prevent the type of error that occurred. The rest of the dominos fall from there. P&F's conduct

19   violated the WCAA and, as a result, three of the five CPA elements are satisfied. Because these

20   violations injured Howard, she satisfies the last two CPA elements and prevails as a matter of law.

21

22   ---

23   [12] Howard has abandoned her claims under Section 1692e(5) and (10) "for the sake of efficiency." *See* Dkt. No. 23 at 16 ("While these claims are just as viable as those which are the subject of Plaintiff's motion, it is ultimately immaterial to the ultimate finding of liability, as 'a single violation of any provision of the Act is sufficient to establish civil liability under the FDCPA.'" (quoting *Taylor v. Perrin, Landry, deLaunay & Durand*, 103 F.3d 1232, 1238 (5th Cir. 1997))).

24

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT - 9

1  **A.      Jurisdiction**

2          28 U.S.C. § 1446(b) requires that a defendant file a notice of removal "within 30 days after

3  the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting

4  forth the claim for relief upon which such action or proceeding is based[.]" On May 25, 2021, P&F

5  filed a notice of removal of Howard's lawsuit in this Court. Dkt. No. 1. However, Howard had not

6  yet filed any lawsuit against P&F. *Id.* at 1. P&F asserts that it was entitled to remove the case "to

7  preserve its right to remove" after it "became aware" of Howard's state court complaint on May

8  5, 2021. Dkt. No. 1 at 1–2.

9          A case may be removed to federal court only after it is commenced in state court. *Bush v.*

10  *Cheaptickets, Inc.*, 425 F.3d 683, 686 (9th Cir. 2005). "A state's own laws and rules of procedure

11  determine when a dispute may be deemed a cognizable legal action in state court." *Id.* Under

12  Washington law, state courts have jurisdiction over cases "[f]rom the time of commencement of

13  the action by service of summons, or by the filing of a complaint[.]" Wash. Rev. Code § 4.28.020.

14  "[A] civil action is commenced by service of a copy of a summons together with a copy of a

15  complaint . . . or by filing a complaint." Wash. Superior Ct. Civ. R. 3(a). A state court therefore

16  acquires jurisdiction over a matter upon the service of a summons and complaint. *Seattle*

17  *Seahawks, Inc. v. King Cnty.*, 913 P.2d 375, 376 (Wash. 1996). The commencement of a civil

18  action also renders the matter removable. *See, e.g.*, *Alderson v. Delta Air Lines, Inc.*, C18-1374-

19  JLR, 2018 WL 5240811, at *3 (W.D. Wash. Oct. 22, 2018) ("The time period for removal was

20  triggered by service of the summons and complaint, regardless of the fact that [the plaintiff] never

21  filed his complaint in state court."); *Dustin v. Meridian Fin. Servs.*, C17-1087-JCC, 2017 WL

22  3773714, at *2–3 (W.D. Wash. Aug. 31, 2017).

23          P&F does not explain in its Notice of Removal how it "became aware" of Howard's

24  complaint, making it unclear whether the case had actually been commenced in state court at the

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT - 10

1    time of removal. *See generally* Dkt. No. 1. However, P&F's Verification of State Court Records

2    states that it was served with the summons and complaint prior to removal. Dkt. No. 3 at 1. The

3    Court therefore presumes that such service occurred no earlier than the date that P&F "became

4    aware" of Howard's complaint—May 5, 2021. Dkt. No. 1 at 2. Accordingly, Howard's suit

5    commenced no earlier than May 5, 2021, and P&F's notice of removal, filed on May 25, 2021, fell

6    within the thirty-day removal period. 28 U.S.C. § 1446(b).

7         The Court has original jurisdiction over Howard's FDCPA claims, *see* 28 U.S.C. § 1331,

8    and exercises supplemental jurisdiction over her related state law claims, *see id.* § 1367(a) (a

9    district court has supplemental jurisdiction over state law claims that "are so related to" the federal

10   claims "that they form part of the same case or controversy").

11   **B.    Legal Standard**

12        Summary judgment is appropriate only when "the movant shows that there is no genuine

13   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

14   Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this

15   stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the

16   evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

17   sided that one party must prevail as a matter of law." *Id.* at 251–52.

18        When parties file simultaneous cross-motions for summary judgment on the same claim,

19   the Court "must consider the appropriate evidentiary material identified and submitted in support

20   of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous.*

21   *Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001); *see also*

22   *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (the district court

23   "rule[s] on each party's motion on an individual and separate basis, determining, for each side,

24   whether a judgment may be entered in accordance with the Rule 56 standard." (cleaned up)). The

1     Court "giv[es] the nonmoving party in each instance the benefit of all reasonable inferences."

2     *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003). However, to the extent

3     the Court resolves factual issues in favor of the nonmoving party, this is true "only in the sense

4     that, where the facts specifically averred by that party contradict facts specifically averred by the

5     movant, the motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

6          The Court will enter summary judgment "against a party who fails to make a showing

7     sufficient to establish the existence of an element essential to that party's case, and on which that

8     party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

9     Once the moving party has carried its burden under Rule 56(c), "the nonmoving party must come

10    forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus.*

11    *Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis

12    omitted). Metaphysical doubt is insufficient, *id.* at 586, as are conclusory, non-specific affidavits,

13    *Lujan*, 497 U.S. at 888–89. Nor is it the Court's job to "scour the record in search of a genuine

14    issue of triable fact"; rather, the nonmoving party must "identify with reasonable particularity the

15    evidence that precludes summary judgment." *Kennan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)

16    (cleaned up).

17    **C.**    **FDCPA Claims**

18          Congress passed the FDCPA to take aim at "abusive debt collection practices by debt

19    collectors[.]" 15 U.S.C. § 1692(e).[13] The statute advances this goal by "authoriz[ing] private civil

20    actions against debt collectors who engage in certain prohibited practices." *Rotkiske v. Klemm*, 140

21    S. Ct. 355, 358 (2019); *see also McAdory v. M.N.S. & Assocs., LLC*, 952 F.3d 1089, 1092 (9th Cir.

22    2020) (the FDCPA is "broadly remedial" and must be "liberally construe[d]" in favor of

23

24    ------------------------------------------------

[13] The parties do not dispute that Howard is a "consumer" and P&F is a "debt collector" under the FDCPA. Dkt. No. 17-3 at 64–65; *see* 15 U.S.C. § 1692a(3), (6).

consumers). Relevant here are two sections of the FDCPA. First, Section 1692e broadly prohibits the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." Section 1692e also includes a nonexclusive list of 16 practices that are deemed to be "false, deceptive, or misleading," one of which is misrepresenting "the character, amount, or legal status of any debt[.]" 15 U.S.C. § 1692e(2)(A); *see Stimpson v. Midland Credit Mgmt., Inc.*, 944 F.3d 1190, 1195 (9th Cir. 2019). Second, Section 1692f of the FDCPA implements a sweeping ban on the use of "unfair or unconscionable means to collect or attempt to collect any debt." As with Section 1692e, Congress chose to supplement Section 1692f's general proscription with eight nonexclusive examples of "unfair or unconscionable means" of debt collection. *See Mandelas v. Gordon*, 785 F. Supp. 2d 951, 955 (W.D. Wash. 2011). One of these specific provisions bars the collection of "any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1). A debt collector who violates any of these provisions "is liable for actual damages, attorney's fees and costs, and additional damages not to exceed $1,000 per violation." *Urbina v. Nat'l Bus. Factors Inc.*, 979 F.3d 758, 763 (9th Cir. 2020) (citing 15 U.S.C. § 1692k).

1.   Strict Liability, the "Least Sophisticated Debtor" Standard, and Materiality

The FDCPA is a strict liability statute, *Clark v. Cap. Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1175 (9th Cir. 2006), meaning debt collectors are "liable for violations that are not knowing or intentional," *Reichert v. Nat'l Credit Sys., Inc.*, 531 F.3d 1002, 1005 (9th Cir. 2008). In determining whether a debt collector's conduct violates Section 1692e or 1692f, the Court "undertake[s] an objective analysis" and asks "whether the least sophisticated debtor would likely be misled by [the] communication" at issue. *Stimpson*, 944 F.3d at 1196 (cleaned up); *see also Donohue v. Quick Collect, Inc.*, 592 F.3d 1027, 1030 (9th Cir. 2010). "This is a legal, not a factual,

1 determination." *Stimpson*, 944 F.3d at 1196. And under this standard, a plaintiff-debtor need not

2 show that she was "actually misled or deceived by the debt collector's representation; instead,

3 liability depends on whether the *hypothetical* 'least sophisticated debtor' likely would be misled."

4 *Tourgeman v. Collins Fin. Servs., Inc.*, 755 F.3d 1109, 1117–18 (9th Cir. 2014) (emphasis in

5 original).

6       The hypothetical least sophisticated debtor is "distinguished from the ordinary, reasonable

7 person by being financially unsophisticated," and "is comparatively uninformed and naive about

8 financial matters and functions as an 'average consumer in the lowest quartile . . . of consumer

9 competence.'" *Stimpson*, 944 F.3d at 1196 (quoting *Evory v. RJM Acquisitions Funding L.L.C.*,

10 505 F.3d 769, 774 (7th Cir. 2007)); *see also Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015,

11 1027 (9th Cir. 2012) (the hypothetical least sophisticated debtor is "uninformed, naive, and

12 gullible"). However, "the standard preserves a quotient of reasonableness and presumes a basic

13 level of understanding and willingness to read with care." *Gonzalez v. Arrow Fin. Servs., LLC*,

14 660 F.3d 1055, 1062 (9th Cir. 2011) (cleaned up). The least sophisticated debtor is therefore

15 "reasonable and functional, but lacks experience and education regarding financial matters."

16 *Stimpson*, 944 F.3d at 1196.

17       One last preliminary point: the FDCPA punishes only material false statements. *Donohue*,

18 592 F.3d at 1033. Material false statements are "those that could 'cause the least sophisticated

19 debtor to suffer a disadvantage in charting a course of action in response to the collection effort.'"

20 *Afewerki v. Anaya Law Grp.*, 868 F.3d 771, 773 (9th Cir. 2017) (quoting *Tourgeman*, 755 F.3d at

21 1121). "Immaterial false representations, by contrast, are those that are literally false, but

22 meaningful only to the hypertechnical reader." *Id.* at 776 (cleaned up); *see also Donohue*, 592 F.3d

23 at 1034 (immaterial false statements "do not affect a consumer's ability to make intelligent

24

1    decisions" because they are "mere technical falsehoods that mislead no one"). With these

2    principles in mind, the Court turns to Howard's FDCPA claims.

3              2.    Violation of Sections 1692e and 1692e(2)(A)

4          Howard bases her claims on four communications: (1) the December 21, 2020 call with

5    one of P&F's account representatives; (2) the February 18, 2021 settlement letter; (3) the February

6    25, 2021 call with the second P&F account representative; and (4) the March 25, 2021 call with

7    the third P&F account representative. *See* Dkt. No. 23 at 10–11. She argues that each time P&F

8    represented that she owed money, "it was false, deceptive, and misleading because she did not, in

9    fact, owe any money." Dkt. No. 17 at 11–12; Dkt. No. 23 at 9 ("[A]ny time P&F demanded money

10   from Ms. Howard after August 2018, it was a violation of the FDCPA."). Howard further contends

11   that P&F's conduct was false and misleading every time it "attempted to justify the amounts owed"

12   because its explanations about interest calculations and costs "made absolutely no sense." Dkt. No.

13   17 at 12. She takes issue with P&F's "wildly different explanation[s]" each time she spoke with

14   an account representative. *Id.* ("P&F made innumerable false, deceptive, and misleading

15   statements about the debt and about its characterization[.]").

16         P&F responds with a creative yet strained argument. According to it, the clerk's failure to

17   mail the final garnishment check means that the debt technically remained unpaid for nearly three

18   years: "[t]he amount of the debt reported by Patenaude was correct because, . . . as a matter of law,

19   Patenaude was not paid until it actually received the money at issue." Dkt. No. 20 at 15. Thus, the

20   argument goes, P&F did not use a false, deceptive, or misleading representation and did not

21   otherwise misrepresent the character, amount, or legal status of the debt. *See id.* ("Patenaude and

22   its employees provided accurate information based on the funds it had actually received."). P&F

23   marshals a page-and-a-half string cite in support of the notion that "payment is not effectuated

24

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT - 15

1  until the remittance gets into the hands of the creditor." *See id.* at 12–13 (collecting cases from

2  other jurisdictions); Dkt. No. 25 at 3 (citing a Washington case).

3        P&F's liability thus turns on whether the debt remained, as a matter of law, unpaid until

4  P&F received the final garnishment funds from the clerk. Framed another way, the dispositive

5  question is whether Howard owed a balance on the 2016 judgment even after her wages were

6  garnished simply because the clerk failed to transmit those funds from the court registry to P&F.

7  The Court rejects P&F's argument.

8        In Washington, payment generally requires "receipt of funds by the creditor and the

9  intention of both parties that the funds should constitute payment." *U.S. Bank Nat'l Ass'n v.*

10  *Whitney*, 81 P.3d 135, 140 (Wash. Ct. App. 2003); *accord Revitalization Partners, LLC v. Equinix,*

11  *Inc.*, No. C16-1367-JLR, 2017 WL 823291, at *3 (W.D. Wash. Mar. 2, 2017). The Court

12  acknowledges this common law principle. It likewise recognizes district authority (cited by neither

13  party), which suggests that depositing funds into the court registry is insufficient to effectuate

14  payment to a creditor. *See King v. O/S Nordic Maiden*, 587 F. Supp. 46, 48 (W.D. Wash. 1984)

15  (depositing funds into court registry does not "constitute 'receipt' of funds, constructive or

16  otherwise, by the creditors"). However, the general common law rule must yield to the statutory

17  garnishment procedure, which prescribes the exclusive method of payment during garnishment

18  proceedings. The facts of *King* help demonstrate why this is so.

19        In *King*, purchasers contracted to make incremental payments on a boat. *Id.* at 47. Before

20  the first payment was due, however, they deposited the full purchase amount in the superior court

21  registry and sued the previous owner for reformation of the sale contract. *Id.* The previous owner

22  then filed a separate action to foreclose on the preferred ship mortgage, arguing that the purchasers

23  had defaulted by failing to pay him under the terms of the contract. *Id.* at 47–48. Although the

24  Court observed that payment can entail "actual or constructive delivery," it found that in the

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT - 16

1   circumstances of that case, the purchasers' deposit of funds in the court registry did not constitute

2   receipt of those funds by the previous owner because it was not "evidence that [they] made any

3   offer to [the owner] of the installment due." *Id.* at 48. In other words, it was not evidence of "a

4   willingness, accompanied by the ability and an attempt, to pay." *Id.*

5          Here, and in contrast to *King*, Washington's garnishment statute governed the method of

6   payment, and the garnishee's payment is evidence of a willingness, accompanied by the ability

7   and an attempt, to pay. *See Watkins v. Peterson Enters., Inc.*, 973 P.2d 1037, 1043 (Wash. 1999)

8   ("Garnishment is a statutory remedy that requires strict adherence to the procedures expressly

9   authorized by statute."). Indeed, the garnishment statute not only directs the garnishee to deposit

10  garnished funds into the court registry, but also contemplates that payment is effectuated once the

11  garnishee does so. *See* Wash. Rev. Code § 6.27.250(a)(1) ("[T]he court shall order the garnishee

12  to *pay to the plaintiff* or the plaintiff's attorney *through the registry of the court* the amount of the

13  judgment against the garnishee[.]") (emphasis added). The remainder of the process—moving to

14  disburse and disbursement of the funds—is within the exclusive control of the plaintiff and the

15  court clerk. *See id.*

16         Howard no longer owed P&F $492.32 once it was garnished from her wages and

17  transmitted to the court registry. At that point, the money was constructively delivered to P&F and

18  it was within P&F's sole province to move the court for an order disbursing the funds. It was

19  likewise P&F's responsibility to thereafter track the garnishment funds into its pockets. Although

20  the Court recognizes the clerk's statutory duty to "disburse the payment to the plaintiff," *see* Wash.

21  Rev. Code § 6.27.250(1)(a), P&F's failure to confirm whether those funds made it into its account

22  (for over two years) cannot fall on the shoulders of unsuspecting debtors like Howard.

23         It bears repeating that the FDCPA "is a remedial statute aimed at curbing what Congress

24  considered to be an industry-wide pattern of and propensity towards abusing debtors[.]" *Clark*,

460 F.3d at 1171. Accordingly, the Ninth Circuit has repeatedly emphasized that "debt collectors—repeat players likely to be acquainted with the legal standards governing their industry—[must] bear the brunt of the risk" when their conduct tests the boundaries. *Clark*, 460 F.3d at 1171; *Gonzalez*, 660 F.3d at 1063 ("Where the law places affirmative limits on a debt collector's actions, the debt collector that goes perilously close to an area of proscribed conduct takes the risk that it will be liable under the FDCPA for misleading consumers." (cleaned up)).

The upshot should by now be clear. On at least four occasions, P&F represented to Howard that she owed a balance even though it had already garnished the full amount from her bank account and wages.[14] Because such communications would have likely misled the least sophisticated debtor, P&F violated Sections 1692e and 1692e(2)(A). *See White v. Skagit Bonded Collectors, LLC*, No. C21-0697-LK, 2022 WL 2046286, at *7 (W.D. Wash. June 7, 2022) ("A debt collector violates Section 1692e by continuing to attempt to collect a debt that is no longer owed."); *Creager v. Columbia Debt Recovery*, No. 21-CV-00431-BJR, 2022 WL 2982825, at *3 (W.D. Wash. July 28, 2022) ("[E]ach time Defendant contacted Plaintiff to collect the remaining balance, it was, objectively, falsely representing the amount of debt she owed[.]"); *Snyder v. Daniel N. Gordon, P.C.*, No. C11-1379-RAJ, 2012 WL 3643673, at *3 (W.D. Wash. Aug. 24, 2012) (debt collector's false representations of the amount owed violated Section 1692e(2)(A)).

The Court further "emphasize[s] that a literally true statement can still be misleading." *Gonzalez*, 660 F.3d at 1062. P&F's representations to Howard that it never received the final

---

[14] Even if Howard still legally owed the final $492.32 that was garnished from her wages but not credited to her account, she would not have owed the amount that P&F repeatedly represented and sought to collect. It is mathematically impossible for a balance of $499.38, *see* Dkt. No. 17-3 at 10, to appreciate to $1,011.47 in under three years when it was accruing just 10 cents in interest per day. *See* Dkt. No. 23 at 10 ("There is no mathematical scenario in which interest could have accrued to bring the balance to $1,011.47."). As Howard notes, 10 cents per day amounts to $36.50 per year. *Id.* P&F's communications to Howard therefore violated Sections 1692e and 1692e(2)(A) even if she legally owed some amount of debt. *See Afewerki*, 868 F.3d at 777 (an overstatement of the principal debt is a material false statement that would likely mislead the least sophisticated debtor); *Williams v. Columbia Debt Recovery, LLC*, 579 F. Supp. 3d 1203, 1210 (W.D. Wash. 2022) (same).

garnishment amount may have been literally true, but they were nonetheless deceptive and misleading because they suggested that Howard needed to pay an amount (plus additional interest) that had already been garnished from her wages. *See Afewerki*, 868 F.3d at 777 ("[T]he least sophisticated debtor in Afewerki's position . . . may well have simply paid the amount demanded in the complaint and would have overpaid by approximately $3,000."). This is especially true of P&F's conduct beginning in late December 2020, when it continued to make these representations to Howard despite its knowledge that the garnished funds were still in the court registry due to an administrative oversight. *See Johnson v. Columbia Debt Recovery, LLC*, No. C20-573-RSM, 2021 WL 796332, at *3 (W.D. Wash. Mar. 2, 2021) ("The fact that CDR continued to attempt to collect on the debt after being put on notice of their error, and continued to report the debt on Ms. Puloka's credit, is significant and makes this a material breach of the FDCPA in the eyes of the Court."); *cf. McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 952 (9th Cir. 2011) (debt collector's service of false requests for admission violated the FDCPA because debt collector "had information in its possession that demonstrated the untruthfulness of the requested admissions").[15]

### 3.   Violation of Sections 1692f and 1692f(1)

Howard next argues that P&F violated Sections 1692f and 1692f(1) "when it told [her] that a debt was owed, and that the debt was comprised of various charges, fees, interest, and other amounts that were nonsensical." Dkt. No. 23 at 11; Dkt. No. 17 at 12 ("It is axiomatic that it is unfair and unconscionable for a debt collector to collect more than what was owed, and then come back two years later and try to collect more."). She again relies on the four communications noted

---

[15] Because P&F violated Sections 1692e and 1692e(2)(A) by attempting to collect a debt that was no longer owed, the Court need not address P&F's allegedly inconsistent explanations for the remaining balance on Howard's account. Put differently, the Court has already determined that the four communications Howard points to violated Sections 1692e and 1692e(2)(A), and it is unnecessary to determine whether another aspect of those communications violated those same provisions. This is different than determining whether a communication has violated multiple sections of the FDCPA. *See Clark*, 460 F.3d at 1177 (noting that one action can give rise to multiple violations of the FDCPA).

1    above. *See* Dkt. No. 23 at 10–11. And again, P&F maintains that the amounts it sought were

2    authorized by law because it had not yet received the final garnishment funds. *See* Dkt. No. 20 at

3    19; Dkt. No. 25 at 7.

4        The Court finds P&F's argument unpersuasive for the reasons just discussed. It also notes

5    that a debt collector's misconduct can violate multiple provisions of the FDCPA. *See Clark*, 460

6    F.3d at 1177 ("[W]e (as well as other courts) routinely have allowed debtors to pursue causes of

7    action[] under multiple sections of the FDCPA, even though each violation was based upon the

8    same circumstances."); *Fox v. Citicorp Credit Servs., Inc.*, 15 F.3d 1507, 1516 n.10 (9th Cir. 1994)

9    ("[I]t is not unusual for an action to violate more than one FDCPA provision.").[16] That is the case

10    here. For starters, P&F's February 18, 2021 settlement letter was a direct solicitation for partial

11    payment of a debt that Howard no longer owed. *See* Dkt. No. 17-2 at 6 ("This is an attempt to

12    collect a debt[.]"). And P&F's misrepresentations during the December 21, 2020, February 25,

13    2021, and March 25, 2021 phone calls were attempts to collect payment for a debt that, again, she

14    no longer owed. *See* Dkt. No. 17-3 at 17, 26, 47–48 ("This call is an attempt to collect a debt[.]").

15    Indeed, during the last of these calls, the account representative told Howard that she would need

16    to provide her pay stubs as proof that the final garnishment occurred. *See id.* at 54–56.

17        These communications therefore amounted to "unfair or unconscionable means" of

18    collecting a debt, 15 U.S.C. § 1692f, and the $1,011.47 P&F sought was—for the reasons already

19    discussed—not "permitted by law," *id.* § 1692f(1). *See Creager*, 2022 WL 2982825, at *4 (plaintiff

20    established a violation of Section 1692f(1) "for the same reason as Defendant's violations of

21    Sections 1692e and 1692e(2)"—the balance sought "contained a $1,250 amount that was not

22

23
24

---

[16] However, this does not mean that "a violation of one provision of the FDCPA *automatically* constitutes a violation of another." *Clark*, 460 F.3d at 1178 n.12; *accord Opico v. Convergent Outsourcing, Inc.*, No. C18-1579-RSL, 2021 WL 1611505, at *9 (W.D. Wash. Apr. 26, 2021).

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT - 20

1    'permitted by law'"); *Williams v. Columbia Debt Recovery, LLC*, No. C20-01718-MAT, 2022 WL

2    167516, at *4 (W.D. Wash. Jan. 12, 2022) (defendant's "material misrepresentation of the balance

3    owed by Plaintiff and its attempts to collect on this debt" violated Sections 1692e, 1692e(2), 1692f,

4    and 1692f(1)); *Schore v. Renton Collections, Inc.*, No. C17-1777-JCC, 2018 WL 2018417, at *3

5    (W.D. Wash. May 1, 2018) (defendant's attempt to collect a debt no longer owed violated Section

6    1692f because, under least sophisticated debtor standard, plaintiffs "could have reasonably thought

7    they had to pay the same debt twice"); *Dawson v. Genesis Credit Mgmt., LLC*, No. C17-0638-

8    JCC, 2017 WL 5668073, at *3 (W.D. Wash. Nov. 27, 2017) (communications containing false

9    representations about the amount owed violated Section 1692f "because they were an unfair

10   attempt to collect amounts" not legally owed).[17]

11          The Court will, however, account for multiple violations based on the same conduct when

12   calculating damages at trial. *See Clark*, 460 F.3d at 1178 (noting that Congress did not intend to

13   "create windfalls" and instructing district courts to account for multiple-violation circumstances

14   during the calculation of damages); *accord Dawson*, 2017 WL 5668073, at *3 n.4.

15          4.   P&F's Bona Fide Error Defense

16          P&F contends that, even if its conduct violated the FDCPA, it is nonetheless shielded from

17   liability by the bona fide error defense. Dkt. No. 20 at 20; Dkt. No. 25 at 9. A debt collector cannot

18   be held liable under the FDCPA if it "shows by a preponderance of the evidence that the violation

19   was not intentional and resulted from a bona fide error notwithstanding the maintenance of

20   procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). This is an

21   "affirmative defense" and a "narrow exception to strict liability under the FDCPA[.]" *Clark*, 460

22

23   _____

[17] Here again, the Court need not address P&F's allegedly inconsistent explanations for the debt it believed Howard

24   owed. Nor is it necessary to examine whether that amount included "court fees that were unlawful, or inflated interest."
     Dkt. No. 17 at 12. The Court has already determined that each communication violated Sections 1692f and 1692f(1).

1    F.3d at 1177; *Kaiser v. Cascade Capital, LLC*, 989 F.3d 1127, 1139 (9th Cir. 2021) (the bona fide

2    error defense "relieves liability for certain 'unintentional' violations, thereby functioning similarly

3    to a mens rea requirement."). P&F bears the burden of proving that "(1) it violated the FDCPA

4    unintentionally; (2) the violation resulted from a bona fide error; and (3) it maintained procedures

5    reasonably adapted to avoid the violation." *McCollough*, 637 F.3d at 948.

6          The Court assumes without deciding that the violations discussed above were unintentional

7    and resulted from bona fide errors. Even so, P&F is not shielded from liability because it has failed

8    to show that it maintained procedures reasonably adapted to avoid the specific error that occurred

9    here. *See Urbina*, 979 F.3d at 765 (the procedures must be "consistently applied by collectors on

10   a debt-by-debt basis" and "genuinely calculated to catch errors of the sort that occurred"). The

11   Court emphasizes that a debt collector may not "sit back and wait" for a mistake to occur "and

12   then institute procedures to prevent a recurrence." *Reichert*, 531 F.3d at 1007. Rather, it "has an

13   affirmative obligation to maintain procedures designed to avoid discoverable errors[.]" *Id.*; *Jerman*

14   *v. Carlisle, McNellie, Rini, Kramer & Ulrich, LPA*, 559 U.S. 573, 587 (2010) ("[T]he relevant

15   procedures are ones that help to avoid errors like clerical or factual mistakes."). And "[d]oing this

16   'require[s] more than a mere assertion' that procedures were maintained and reasonably adapted;

17   '[t]he procedures themselves must be explained, along with the manner in which they were adapted

18   to avoid the error.'" *Frias v. Patenaude & Felix APC*, No. C20-0805-JCC, 2022 WL 136816, at

19   *5 (W.D. Wash. Jan. 14, 2022) (quoting *Reichert*, 531 F.3d at 1007) (alterations in internal

20   quotation marks original)).

21         P&F asserts that it "maintains policies and procedures regarding wage garnishments, one

22   policy of which is entitled [sic] Wage Garnishment Instructions, which provides a detailed multi-

23   step procedure for how to proceed on a garnishment." Dkt. No. 20 at 22 ("The Wage Garnishment

24   Instructions are a comprehensive list of actions that Patenaude must take in order to properly

1    handle garnishment matters."). In support of this argument, P&F points to the declaration of

2    attorney Matthew Cheung. *Id.* But Cheung simply avers that all P&F employees "are required to

3    review and recertify that they understand each and every Patenaude policy on an annual basis

4    through the firm's internal compliance software." Dkt. No. 22 at 2. He confirms that these "policies

5    and procedures include . . . (1) Account Balances, (2) Litigation Practices, (3) Post Judgment

6    Procedure, and (4) Wage Garnishment Instructions." *Id.* Cheung further adds that all P&F

7    employees are "tested annually on the FDCPA." *Id.* But he does not elaborate on any of these

8    procedures or explain the significance of certain steps in preventing the kind of oversight and

9    repeated miscommunication that happened here: "[u]pon receipt of the funds from a court, it is

10   Patenaude's policy to record receipt of the funds, apply funds to an account, and adjust the amount

11   due on the account." *Id.*

12       This cursory overview of various procedures and employee trainings "do[es] not provide

13   the kind of detail and depth of explanation *Reichert* requires." *Snyder*, 2012 WL 3643673, at *4;

14   *see Creager*, 2022 WL 2982825, at *6 (defendant "merely allude[d] vaguely to broad training

15   topics without any explanation, or supporting evidence, showing what that training specifically

16   entailed and how it could have prevented" the error); *Roadhouse v. Patenaude & Felix, A.P.C.*,

17   No. 2:13-CV-00560-GMN-CWH, 2015 WL 1691885, at *3 (D. Nev. Apr. 14, 2015) (extensive

18   list of general procedures and employee trainings accompanied by self-serving attorney affidavit

19   were insufficient).

20       P&F must move beyond conclusory assertions and general procedures to show that its

21   violations are entitled to the bona fide error defense. Here, it not only fails to explain its procedures

22   in sufficient detail, but also omits any discussion as to how these procedures specifically target the

23   error that occurred. A sufficient response would, at minimum, articulate how the Wage

24   Garnishment Instructions account for administrative mishaps at the clerk's office and any

associated delay in disbursement of garnished funds (or, in this case, the clerk's failure to disburse those funds altogether). Such a response might also identify the instructions tailored to situations in which funds are garnished from debtors but not yet delivered to P&F due to administrative delay. P&F thus fails to meet its burden under the bona fide error defense. *See, e.g.*, *McCollough*, 637 F.3d at 948 ("JLR thus presented no evidence of procedures designed to avoid the specific errors that led to its filing and maintenance of a time-barred collection suit against McCollough."); *Engelen v. Erin Capital Mgmt., LLC*, 544 F. App'x 707, 708–09 (9th Cir. 2013) (debt collector's procedures, "which consisted of legal compliance training [and] a written policy describing how payment notifications were to be handled," were not "aimed at preventing wrongful wage garnishments caused by the bookkeeper's failure to record payment information"); *Goodin v. Bank of Am., N.A.*, 114 F. Supp. 3d 1197, 1208–09 & n.12 (M.D. Fla. 2015) (defendant was not entitled to bona fide error defense where at least two of its employees knew that it simply needed to file a transfer of claim to obtain debtors' funds from the bankruptcy court registry, yet defendant "still proceeded to misrepresent the amount the [debtors] owed"; its procedures were insufficient to respond to the debtors' complaints and to communicate internally about its knowledge regarding the transfer of claim and were therefore not reasonably adapted to avoid the errors).

Nor does the Court's independent review of the Wage Garnishment Instructions reveal any procedure adapted to prevent what happened here. *See* Dkt. No. 22-3. Much like Cheung's declaration, the relevant portion of these instructions ("Step 4") merely recounts the fact that P&F reduces the defendant's account balance only once it receives the garnishment check. *Id.* at 3.[18]

---

[18] The Court notes that these instructions vary in several respects from the procedure followed in this case, as well as the garnishment procedure mandated by Washington law. In terms of P&F's payment, the instructions indicate that first, a P&F paralegal sends a copy of the court's judgment on answer to the defendant's employer-garnishee "with a letter instructing them to send the garnished funds to [P&F's] office." Dkt. No. 22-3 at 3. Next, the employer "sends a check to [P&F's] office," following which "[t]he balance is reduced by the garnished funds." *Id.* This is not how a plaintiff receives payment under Washington's garnishment statute, as discussed at length above.

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT - 24

1   Nothing obligates P&F account representatives to, for example, periodically track disbursed funds

2   after the court issues its order or set automated reminders to confirm P&F's receipt of the funds.

3   Nowhere do the Wage Garnishment Instructions prescribe follow-up measures for ensuring that

4   P&F (1) actually receives funds disbursed by the court clerk and/or (2) credits the accounts of

5   debtors with funds that have been garnished from them but, due to administrative delay, have not

6   yet been received by P&F. The instructions are likewise silent as to precautions that account

7   representatives must take when re-initiating collection on a dormant account like Howard's, which

8   had no activity for over two years. Indeed, P&F maintained procedures conducive to the very

9   mistake that occurred here: "Patenaude does not make adjustments on the amounts due upon a

10  promise to pay or upon being informed that a check is in the mail. Patenaude appropriately waits

11  until it actually receives the funds to make adjustments to the account." Dkt. No. 22 at 2. This

12  scenario is familiar to P&F. *See Frias*, 2022 WL 136816, at *5 ("Based on P&F's evidence, even

13  strictly following the procedures articulated by P&F would not have stopped the 2020 mailing

14  from going to Plaintiff.").

15      P&F nonetheless contends that the Wage Garnishment Instructions meet the specific

16  adaptation requirement "because [it] followed everything that it was supposed to do and, if [it] had

17  received the funds from [the superior court], the matter could have been closed in 2018." Dkt. No.

18  20 at 22. According to P&F, "the failure of the clerk to provide what it was supposed to provide

19  as part of the system . . . led to the matters complained of by [Howard] in this case." *Id.* But the

20  relevant inquiry is not the literal source or cause of the error; it is whether the procedures

21  maintained by P&F were sufficiently tailored to prevent that error. P&F's argument conflates the

22  underlying cause of the error (the clerk's administrative blunder) with the resulting error giving

23  rise to liability (P&F's surrounding conduct, i.e., repeatedly attempting to collect a debt when the

24  garnished funds were in the court registry). Put another way, P&F seeks to outsource its statutory

1  obligations—and the consequences for failing to abide by them—to a third party. This it cannot

2  do. *See Urbina*, 979 F.3d at 761 (procedures relied on "did little more than evidence an attempt to

3  outsource the duties the FDCPA imposes upon debt collectors").[19]

4          Howard is therefore entitled to summary judgment on P&F's liability under the FDCPA.

5  **D.     CPA Claims**

6          Howard next alleges per se CPA claims predicated on P&F's alleged violations of the

7  WCAA and FDCPA. Dkt. No. 17 at 13; Dkt. No. 1-1 at 7–8; *see Leach v. NCO Fin. Sys., Inc.*, No.

8  C15-0890-JLR, 2015 WL 5675794, at *5 (W.D. Wash. Sept. 25, 2015) (the WCAA is enforced

9  by private litigants through the CPA). To establish a CPA claim, Howard must show (1) an unfair

10 or deceptive act or practice, (2) in trade or commerce, (3) impacting the public interest, (4) an

11 injury to her property, and (5) legal causation. *Hangman Ridge Training Stables, Inc. v. Safeco*

12 *Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986). "A *per se* CPA claim lets a plaintiff satisfy the

13 first three parts of this test by proving a predicate violation of 'a statute that contains a specific

14 legislative declaration of public interest impact.'" *Frias*, 2022 WL 136816, at *6 (quoting Wash.

15 Rev. Code § 19.86.093(2)). The WCAA is one such statute. *See Panag v. Farmers Ins. Co.*, 204

16 P.3d 885, 897 (Wash. 2009); Wash. Rev. Code § 19.16.440; *accord Weinstein v. Mandarich Law*

17 *Grp., LLP*, 798 F. App'x 88, 91 (9th Cir. 2019) ("[V]iolations of the WCAA are per se violations

18 of the state consumer protection law."). Courts have likewise held that a violation of the FDCPA

19 constitutes a per se violation of the CPA. *See Sims v. Midland Funding LLC*, C20-1230-TSZ, 2021

20

21 ─────────────────

22 [19] To the extent P&F's conduct is attributable to its belief that Howard still legally owed a debt until P&F received the
   funds from the clerk, this was a mistake of law. Although the Ninth Circuit treats underlying mistakes of state law as
   mistakes of fact, which can qualify for the bona fide error defense, *see Kaiser*, 989 F.3d at 1139–40; *Creager*, 2022
23 WL 2982825, at *5, P&F's misunderstanding or misapplication of state law is not entitled to the bona fide error
   defense for the reasons discussed above, i.e., it failed to maintain procedures specifically aimed at preventing such an
   error. *See also Reichert*, 531 F.3d at 1007 ("The procedures themselves must be explained, along with the manner in
24 which they were adapted to avoid the error.").

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT - 26

1   WL 1546135, at *5 (W.D. Wash. Apr. 20, 2021); *Collins v. Seterus, Inc.*, No. C17-0943-JCC,

2   2019 WL 1254878, at *7 (W.D. Wash. Mar. 19, 2019).

3       1.   <u>Violations of the WCAA and FDCPA: *Hangman Ridge* Elements 1-3</u>

4       Howard first claims that P&F violated Washington Revised Code § 19.16.250(21) "each

5   and every time it demanded money, since none was owed." Dkt. No. 17 at 14–15. This subsection

6   of the WCAA proscribes "[c]ollect[ing] or attempt[ing] to collect in addition to the principal

7   amount of a claim any sum other than allowable interest, collection costs or handling fees expressly

8   authorized by statute, and, in the case of suit, attorney's fees and taxable court costs." Wash. Rev.

9   Code § 19.16.250(21).[20] Courts have accordingly interpreted this provision "as prohibiting

10  collection agencies from 'attempting to collect amounts not actually owed' and collecting more

11  than what was owed." *White*, 2022 WL 2046286, at *10 (quoting *Panag*, 204 P.3d at 897);

12  *Johnson*, 2021 WL 796332, at *4 (Section 19.16.250(21) "prohibits the collection, or attempted

13  collection, of any amounts not authorized by law"). For the reasons discussed above, P&F violated

14  Section 19.16.250(21) each time it represented to Howard that she owed $1,011.47 on the 2016

15  judgment. *See Creager*, 2022 WL 2982825, at *7 (each attempt to collect a balance that plaintiff

16  did not owe was a violation of subsection 21); *Williams*, 2022 WL 167516, at *4 (all actions taken

17  in furtherance of collecting unauthorized debt were violations of subsection 21); *Schore*, 2018 WL

18  2018417, at *5 (attempt to collect debt already paid constituted an attempt to collect an amount in

19  excess of the principal and not authorized by law); *Dawson*, 2017 WL 5668073, at *4

20  (misrepresentations about debt actually owed violated subsection 21).[21]

21

22  [20] The parties do not dispute that Howard is a "debtor" and P&F is a "collection agency" under the WCAA. Dkt. No. 17-3 at 64–65; *see* Wash. Rev. Code § 19.16.100(4), (8).

23  [21] Howard also contends that P&F violated Washington Revised Code § 19.16.250(15) when it "repeatedly told [her] that her 'obligation' . . . had increased by fees and interest that could not have legally been assessed." Dkt. No. 23 at 23; *see also* Dkt. No. 17 at 15 ("P&F also claimed that 'court costs' contributed to the balance, despite the fact that

24

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT - 27

The Court further finds that, for the reasons discussed in Section II.C., P&F's conduct violated the FDCPA. These violations thus also constitute per se CPA violations. *See Sims*, 2021 WL 1546135, at *5.[22]

2.   Injury and Causation: *Hangman Ridge* Elements 4-5

Since Howard has established that P&F violated the WCAA and FDCPA—and thus satisfies the first three elements of her CPA claim—the Court now turns to injury and causation. These elements are likewise met. Under the CPA, a plaintiff need not prove monetary damages because "unquantifiable damages may suffice." *Panag*, 204 P.3d at 899–900 ("Pecuniary losses occasioned by inconvenience may be recoverable as actual damages."); *Frias v. Asset Foreclosure Servs., Inc.*, 334 P.3d 529, 538 (Wash. 2014) ("Where a business demands payment not lawfully due, the consumer can claim injury for expenses he or she incurred in responding, even if the consumer did not remit the payment demanded."). Howard argues that she "incurred expenses in seeking counsel to determine her legal rights and responsibilities[.]" Dkt. No. 17 at 14; *see also* Dkt. No. 17-2 at 3; Dkt. No. 29-1 at 69–71. Courts have repeatedly found such injury sufficient

---

no such costs had been awarded, which is a prerequisite to collecting such costs under Washington law."). Subsection 15 of the WCAA prohibits collection agencies from "represent[ing] or impl[ying] that the existing obligation of the debtor may be or has been increased by the addition of attorney fees, investigation fees, service fees, or any other fees or charges when in fact such fees or charges may not legally be added to the existing obligation[.]" Wash. Rev. Code § 19.16.250(15). However, Howard did not allege this claim in her complaint. *See* Dkt. No. 1-1 at 7–8. P&F thus correctly observes that she cannot move for summary judgment on this claim. Dkt. No. 20 at 28; *see Smith v. City & Cnty. of Honolulu*, 887 F.3d 944, 951–52 (9th Cir. 2018) ("A defendant suffers prejudice if a plaintiff is allowed to proceed with a new theory of recovery after close of discovery."); *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings." (internal quotation marks and citation omitted).

[22] Howard does not mention this claim anywhere in her summary judgment briefing. Nor does P&F. However, because P&F moved for summary judgment on all issues, the Court sua sponte grants summary judgment in favor of Howard on this claim. *See Gospel Missions of Am. v. City of Los Angeles*, 328 F.3d 548, 553 (9th Cir. 2003) ("Even when there has been no cross-motion for summary judgment, a district court may enter summary judgment sua sponte against a moving party if the losing party has had a 'full and fair opportunity to ventilate the issues involved in the matter.'" (quoting *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 312 (9th Cir. 1982))); *BDR Clyde Hill VII LLC v. Cont'l W. Ins. Co.*, 478 F. Supp. 3d 1097, 1106 (W.D. Wash. 2020) ("Although BDR did not move for summary judgment on its IFCA claim, that does not prevent the Court from granting summary judgment in its favor sua sponte.").

ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT - 28

1    under the CPA. *See, e.g.*, *White*, 2022 WL 2046286, at *10 ("An injury is distinct from damages,

2    and expenses incurred in consulting an attorney about an improperly collected debt suffice to

3    demonstrate injury."); *Frias*, 2022 WL 136816, at *7 (consulting an attorney to dispel uncertainty

4    about a debt and other investigatory costs are sufficient to show injury).

5         3.    <u>P&F's Arguments</u>

6         Despite the well-established and straightforward case law compelling this outcome, P&F

7    targets Howard's CPA claims in several respects. *See* Dkt. No. 20 at 23–35. None of these

8    arguments are availing.

9         a.    *Judicial Action Privilege*

10        P&F asserts that it is protected by the judicial action privilege. *See* Dkt. No. 20 at 25–28.

11   The gist of P&F's defense is that it acted as an attorney representing its creditor-client, TD Bank

12   USA, NA (successor in interest to Target National Bank), and thus cannot be sued for its conduct.

13   *Id.* at 26; *see Block v. Snohomish Cnty.*, No. C18-1048-RAJ, 2019 WL 954809, at *5 (W.D. Wash.

14   Feb. 27, 2019) ("Generally, Washington law establishes that an attorney is immune from litigation

15   by an opposing party for actions taken on behalf of a client against that party, under the doctrine

16   of the 'judicial action privilege.'" (citing *Jeckle v. Crotty*, 85 P.2d 931, 937–38 (Wash. Ct. App.

17   2004))). This argument is unavailing.

18        As Howard observes, P&F raised a materially identical argument in at least two other cases

19   but couched its purported immunity in the litigation privilege. *See* Dkt. No. 23 at 16–17. And as

20   Howard further notes, courts have unanimously rejected the argument. *See Hoffman v. Transworld*

21   *Sys. Inc.*, C18-1132-JCC, 2018 WL 5734641, at *10 (W.D. Wash. Nov. 2, 2018) ("Neither party

22   has cited, and the Court is not aware of, case law holding that *per se* violations of the CPA based

23   on violations of the FDCPA are barred by Washington's litigation privilege."), *reversed on other*

24   *grounds*, 806 F. App'x 549, 551 (9th Cir. 2020) (rejecting defendants' argument on appeal that

they were immune from liability pursuant to the litigation privilege); *Mitchell v. Patenaude &*
*Felix APC*, No. C19-809-JLR-TLF, 2019 WL 4043974, at *8 (W.D. Wash. July 15, 2019)
("Neither party has presented case law, and the Court is not aware of any case law, since Judge
Coughenour's decision in *Hoffman* that would change this analysis."), *report and recommendation*
*adopted*, 2019 WL 4034958 (W.D. Wash. Aug. 27, 2019). Indeed, the Washington Court of
Appeals recently dispelled any lingering doubts about the applicability of the litigation privilege
in these circumstances. *See Scott v. Am. Express Nat'l Bank*, 514 P.3d 695, 701 (Wash. Ct. App.
2022) ("We hold that litigation privilege does not shield collection agencies from CPA claims if
they violate the WCAA.").

P&F nonetheless goes to innovative lengths to distinguish judicial action privilege from its
rejected counterpart. *See* Dkt. No. 20 at 27 (Venn diagram depicting alleged differences). But for
all its creativity, P&F has still failed to identify a material distinction—at least for CPA purposes—
between the two privileges. Nor has the Court uncovered authority to that effect. In fact, the
opposite is true. On remand from the Ninth Circuit in *Hoffman*, P&F argued for the first time that
it was shielded by the judicial action privilege. Judge Zilly rejected this contention. *See Hoffman*
*v. Transworld Sys. Inc.*, No. C18-1132-TSZ, 2021 WL 22590, at *2–3 (W.D. Wash. Jan. 4, 2021)
(rejecting P&F's argument that judicial action privilege applies because P&F "regularly collected
money from consumers and engaged in other pre-litigation, debt-collection activity—as opposed
to merely engaging in the practice of law" (cleaned up)). The Court dismisses P&F's argument on
the same basis, and turns to the five *Hangman Ridge* elements.

      b.    *First Element of Hangman Ridge: Unfair or Deceptive Act*

P&F claims that it did not engage in an unfair act or practice under *Hangman Ridge*'s first
element because the court clerk failed to disburse the garnished funds. *See* Dkt. No. 20 at 23
("Plaintiff cannot show that [Pierce County Superior Court]'s failure to transmit garnishment funds

1   after receiving them from an employer, thereby leading to the funds not registering in an account[,]

2   has the capacity to deceive a substantial portion of the public."). It similarly argues that its conduct

3   was not unfair because it acted "in good faith under an arguable interpretation of existing law[.]"

4   *Id.* at 24.

5          Again, P&F's arguments are squarely foreclosed under Washington law because it violated

6   the FDCPA and WCAA. *See* Wash. Rev. Code § 19.16.440 (declaring violations of the WCAA

7   "*unfair acts* or practices . . . in the conduct of trade or commerce" under the CPA) (emphasis

8   added); *Sims*, 2021 WL 1546135, at *5 (WCAA and FDCPA violations constitute per se CPA

9   violations, meaning the first three elements of the *Hangman Ridge* test are satisfied). This is yet

10  another chapter in P&F's efforts to outsource its legal responsibilities onto the third party that

11  contributed to its error. As discussed, this approach obfuscates the relevant inquiry and overlooks

12  P&F's independent error: namely, its failure to track the garnished funds after it moved for

13  disbursement, to communicate internally regarding its knowledge of administrative oversights, and

14  to track the garnished funds before re-initiating its collection campaign. Most egregious of all,

15  however, is P&F's continued collection efforts despite its paralegal's knowledge that the garnished

16  funds were in the court registry.

17              c.      *Second Element of Hangman Ridge: An Act Occurring in Trade or
                        Commerce*

18

19         Next, P&F contends that Howard fails to meet *Hangman Ridge*'s second element, which

20  requires that the unfair act occur "in trade or commerce." *See* Dkt. No. 20 at 30. This fails for the

21  same reasons as P&F's argument about the first *Hangman Ridge* factor. *See* Wash. Rev. Code

22  § 19.16.440 (declaring violations of the WCAA "unfair acts or practices . . . *in the conduct of trade*

23  *or commerce*" under the CPA) (emphasis added); *Sims*, 2021 WL 1546135, at *5 (WCAA and

24  FDCPA violations constitute per se CPA violations, meaning the first three elements of the

*Hangman Ridge* test are satisfied). In a strained effort to avoid this result, though, P&F characterizes Howard's CPA claims as a challenge to its "competence and strategy" as opposed to the entrepreneurial aspects of its legal practice. Dkt. No. 20 at 30; *see Ramos v. Arnold*, 169 P.3d 482, 486 (Wash. Ct. App. 2007) ("Claims directed at the competence of and strategies employed by a professional amount to allegations of negligence and are exempt from the Consumer Protection Act."). The Court disagrees. P&F again overlooks the fact that Howard alleges per se CPA claims against it, i.e., claims based on statutory violations that automatically satisfy the first three elements of the *Hangman Ridge* test. *See also Michael v. Mosquera-Lacy*, 200 P.3d 695, 699 (Wash. 2009) ("In a legal practice entrepreneurial aspects include 'how the price of legal services is determined, billed, and collected and the way a law firm obtains, retains, and dismisses clients.'" (quoting *Short v. Demopolis*, 691 P.2d 163, 168 (Wash. 1984))); *Lang v. Gordon*, No. C10-819-RSL, 2011 WL 62141, at *3 (W.D. Wash. Jan. 6, 2011) ("[L]awyers who are acting as debt collectors are engaging in the entrepreneurial aspects of law rather than practicing law."). And P&F, which concedes that it is a "collection agency" under the WCAA, *see* Dkt. No. 17-3 at 65, violated that statute.

          d.     *Third Element of Hangman Ridge: Public Interest Impact*

P&F next takes aim at Howard's CPA claims under *Hangman Ridge*'s third element. It suggests that its conduct here does not implicate the public interest because "the event that occurred is very rare and would not be expected to be repeated." Dkt. No. 20 at 31. This reasoning again fails to account for controlling law. *See Panag*, 204 P.3d at 897 ("The business of debt collection affects the public interest, and collection agencies are subject to strict regulation to ensure they deal fairly and honestly with alleged debtors.").

e.     *Fourth and Fifth Elements of Hangman Ridge: Injury and Causation*

P&F's final argument is likewise unavailing. This time P&F attacks the sufficiency of Howard's CPA claims under the last two *Hangman Ridge* elements, suggesting that Howard was not injured because its FDCPA violations were immaterial. *See* Dkt. No. 20 at 32–33. P&F then contends that Howard's injuries "were not caused by Patenaude, but by [the Pierce County Superior Court]'s failure to remit funds held in the court registry." Dkt. No. 20 at 34. As discussed in Section II.D.2, Howard has established injury under the CPA because she incurred costs consulting legal counsel. *See White*, 2022 WL 2046286, at *10. P&F's causation challenge is also meritless. The Court has repeatedly rejected P&F's efforts to frame the source of the error as the error itself. Again, it was P&F's attempts to collect a debt from Howard when her garnished funds were in the court registry that violated the WCAA and FDCPA. And those violations caused her injury. *See Schore*, 2018 WL 2018417, at *6 ("[B]ut for RCI's continuous attempts to collect the debt, the Schores would not have incurred an injury."); *Dawson*, 2017 WL 5668073, at *5 ("[B]ut for Genesis's attempts to collect amounts not owed, Dawson would not have incurred an injury.").

### III.     CONCLUSION

For the foregoing reasons, the Court GRANTS Howard's Motion for Partial Summary Judgment, Dkt. No. 17, and DENIES P&F's Cross-Motion for Summary Judgment, Dkt. No. 20. Damages will be determined by the Court following a bench trial.

Dated this 30th day of September, 2022.

Lauren King
United States District Judge